WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Daniel G. Demer,                )
                                )        CV-11-441-TUC-JGZ
            Plaintiff,           )
                                )        **ORDER**
vs.                             )
                                )
IBM Corporation Ltd. Plan and   )
Metropolitan Life Insurance Company,  )
                                )
            Defendants.          )
_____)

        This matter arises under the Employment Retirement Income Security Act of 1974
("ERISA").  Plaintiff Daniel G. Demer appeals Defendant MetLife's denial of his application
for long term disability benefits.   The parties have filed the following cross motions for
summary judgment and responses:   Plaintiff's Motion for Summary Judgment (Doc. 28);
Defendants' Response to Plaintiff's Motion for Summary Judgment and Defendants' Cross-
Motion for Summary Judgment (Doc. 34); Plaintiff's Reply in Support of Plaintiff's Motion
for Summary Judgment and Plaintiff's Response to Defendants' Cross-Motion for Summary
Judgment (Doc. 41); and Defendants' Reply in Support of Defendants' Motion for Summary
Judgment.  (Doc. 44.)  For the following reasons, the Court will deny Plaintiff's Motion for
Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

                    **FACTUAL AND PROCEDURAL HISTORY**

**A.      The Plan**

        The IBM Corporation Long Term Disability Plan (the "Plan") provides benefits for
participating employees who are "disabled" within the meaning of the Plan.  (DSOF ¶ 1;

PRDSOF ¶ 1.)[1]  MetLife is contracted to act as Claims Adjuster and to fund long term disability ("LTD") benefits under the Plan. (*Id.*)  The Plan provides:

> In carrying out their respective responsibilities under the LTD Plan, the Plan Administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the LTD Plan and to determine eligibility for and entitlement to LTD Plan benefits in accordance with the terms of the LTD Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Doc. 36-3, Administrative Record ("AR") 116.)  The Plan thus delegates discretionary authority to MetLife to determine who is and is not disabled as that term is defined in the Plan. (DSOF ¶ 1; PRDSOF ¶ 1.)

During the first twelve months of qualifying sickness or injury, a participant is "disabled" if he is unable to perform his regular duties with IBM because of sickness or injury. (DSOF ¶ 2; PRDSOF ¶ 2.)  This is commonly known as the "own occupation" period. (*Id.*)  After the expiration of twelve months, the Plan defines the term "disabled" differently; "disabled means that, because of a sickness or injury, you cannot perform the important duties of any other gainful occupation for which you are reasonably fit by your education, training, or experience." (Doc. 36-3, AR 107.)  This is commonly known as the "any occupation" period. (DSOF ¶ 3.)  Among other limiting provisions, the Plan limits benefits for mental or nervous disorders, except schizophrenia, dementia, or organic brain disease, to a lifetime maximum of 24 months. (DSOF ¶ 7; PRDSOF ¶ 7.) Under the terms of the Plan, entitlement to benefits ends when the participant no longer qualifies as disabled or fails to provide proof of such disability. (Doc. 36-3, AR 113.)  When a claim for disability is made, the claimant must provide written evidence that establishes the nature and extent of

---

[1] The parties' statements of facts are abbreviated as follows:  Plaintiff's Statement of Facts (Doc. 29) - "PSOF"; Defendants' Statement of Facts (Doc. 35) - "DSOF"; Defendants' Controverting Statement of Facts (Doc. 35) - "DCSOF"; Plaintiff's Supplemental Statement of Facts (Doc. 42) - "PSSOF"; Plaintiff's Response to Defendants' Statement of Facts (Doc. 43), "PRDSOF"; and Defendants' Controverting Statement of Facts to Plaintiff's Supplemental Statement of Facts (Doc. 45) - "DCSOF2".

the loss or condition; MetLife's obligation to pay the claim; and the claimant's right to receive payment.  (Doc. 36-1, AR 24.)

**B.    Demer's Claim for LTD Benefits under the "Own Occupation" Definition of Disabled**

Demer was employed by IBM and a participant/member of its group disability coverage plan. (PSOF ¶ 1; DSOF ¶ 8.)  Demer worked as the lead internal auditor/assessor and earned approximately $76,000 annually before his last day of work on January 9, 2009. (PSOF ¶ 2.)  On that day, under the terms of the Plan, Demer began receiving Short Term Disability ("STD") benefits, which he continued to receive until they expired on July 10, 2009.  (DSOF ¶ 8; PRDSOF ¶ 8.)

On March 4, 2009, Demer applied for LTD benefits, asserting that he was "unable to do [his] job duties due to severe [and] recurrent depression and spinal stenosis, chronic headaches." (Doc. 37-5, AR 1202.)  Demer stated that his symptoms appeared in March of 2008.  (*Id*.)  His symptoms included headaches, chronic neck and back pain, myalgia, and sciatica.  (*Id*.)  Demer also stated "I do not know when I will be able to perform the duties of my job."  (*Id.*)  In support of his application for LTD benefits, Demer submitted the "Statement of Attending Physician" from his treating psychiatrist, Donald J. Garland, Jr., in which Dr. Garland diagnosed Demer's primary ailment affecting work ability as a "major depressive episode." (Doc. 37-5, AR 1230.) Dr. Garland determined that Demer was totally disabled but could return to work in approximately six months to one year.  (Doc. 37-5, AR 1231.)

MetLife requested additional medical information from Demer to complete its evaluation. (DSOF ¶ 12; PRDSOF ¶ 12.)  In response, Dr. Garland faxed an Initial Psychiatric History and Examination of Demer, which included notes from office visits. (Doc. 37-5, AR 1161-1176.)  In addition to diagnosing Demer with severe depression, Dr. Garland noted that Demer suffered from Chronic Pain Syndrome and Bipolar Type II. (Doc 37-5, AR 1175; Doc. 37-3, AR 1068-69.)  Dr. Garland stated that Demer "is not currently able to engage in his usual occupation on a part or full time basis due to his problems with

concentration, intrusive depressive ideation with significant difficulty making decisions. He would have problems in a work context due to his tearfulness and severe depression." (Doc. 37-3, AR 1069.)

Demer's chiropractor, David D. Heaton, D.C., who treated Demer from February 23, 2009 to April 2009, also provided office notes to MetLife. (DSOF ¶ 14.) Dr. Heaton recommended that a functional capacity test be ordered. (Doc. 37-4, AR 1119-20.) Dr. Heaton noted that Demer would struggle to sit for periods of time over thirty minutes, he squirmed in his seat when speaking with the doctor for five minutes, he suffered headaches, and he could not lift, carry, or handle anything for any length of time over one hour; Dr. Heaton concluded, "Mr. Demers [sic] has significant stenosis and degenerative changes in his spine." (Doc. 37-4, AR 1119.)

MetLife also received office notes from Dr. Debra Weidman, Demer's treating anesthesiologist. Following his chiropractic treatment, Demer returned to Dr. Weidman on April 7, 2009 for an epidural injection procedure. (Doc. 37-4, AR 1082.) Upon conducting a physical exam, Dr. Weidman stated that "[h]e is alert, conversant and oriented x3." (Doc. 37-4, AR 1083.) Dr. Weidman noted that "he really does not have much in the way of radicular pain into his upper extremity. This seems to have quieted down since I had last seen him for cervical epidural injection. He also tells me that his lumbar radioculopathy has been quiet and has not bothered him since 2007." (*Id.*) Her assessment noted that Demer had a history of headaches, cervicogenic and tension; myofascial neck pain; mechanical cervical pain with degenerative disk and facet disease; history of tobacco use; and long term opiate therapy. (*Id.*)

Demer's treating neurologist, Dr. David Weidman, provided MetLife with an "Attending Physician Statement" based on an exam conducted on April 20, 2009. (Doc. 37-4, AR 1086-87.) With regard to Demer's physical capabilities, Dr. David Weidman was of the opinion that Demer could sit and stand intermittently for four to five hours per day, walk six to seven hours intermittently per day, frequently lift up to ten pounds, occasionally lift up to twenty pounds, and never lift twenty-one to fifty pounds. (Doc. 37-4, AR 1086.) Dr.

4

David Weidman commented that he believed Demer's inability to work was due to multiple factors including "chronic pain and depression interact[ing] with each other," and he did not expect improvement in these areas. (*Id.*) Dr. Weidman also submitted to MetLife the results of an Electromyography ("EMG") conducted on July 21, 2009, which noted:"Normal study of left upper extremity.  No evidence for a upper cervical radiculopathy on left." (Doc. 37-3, AR 1056.)

**C.    MetLife Approves Demer's "Own Occupation" Disability**

To assess Demer's depression, MetLife retained Independent Physician Consultant ("IPC") Ernest Gosline, M.D., F.A.P.A., Board Certified in Psychiatry, to review Demer's medical records and prepare an assessment.  (Doc 37-3, AR 1040-44.)  Dr. Gosline concluded that Demer's major depressive disorder, which is worsened by chronic pain, limited his ability to work full time at IBM beyond July 1, 2009.  (Doc 37-3, AR 1041-42.)

Based in part on Dr. Gosline's assessment, MetLife determined that Demer met the "own occupation" definition of "disabled" under the terms of the Plan.  (DSOF ¶ 23; PRDSOF ¶ 23.)  Accordingly, on July 28, 2009, MetLife sent Demer a letter approving his claim for LTD benefits.  (*Id.*)  The letter informed Demer that his "primary diagnosis" was for a mental or nervous disorder, and therefore his LTD benefits are subject to a lifetime benefit period of 24 months.  (Doc. 37-3, AR 1052.)  The letter also reminded Demer that "after expiration of the [initial] 12 month period [of LTD benefits]," the definition of "disabled" would change to the "any occupation" standard.  (DSOF ¶ 23; PRDSOF ¶ 23.)

**D.    Demer's Claim for LTD Benefits under the "Any Occupation" Definition of Disabled**

On November 19, 2009, MetLife sent Demer a letter informing him that to continue receiving benefits beyond July 11, 2010, he "must be disabled from performing any occupation. . . ."  (DSOF ¶ 24; PRDSOF ¶ 24.)  The letter also requested additional medical information from Demer's treating physicians.  (*Id.*)

On January 21, 2010, MetLife Claims Specialist Meera Forbes spoke on the telephone with Demer, who informed her that he continued to see his neurologist, Dr. David Weidman,

his anesthesiologist, Dr. Debra Weidman, his primary care physician, Dr. Moore, and his psychiatrist, Dr. Garland. (Doc 38-1, AR 291-92.) Demer informed Forbes that he ceased using the Fentanyl patch because it made him drowsy and supplanted it with morphine sulphate 15 mgs 2x a day. (Doc 38-1, AR 292.) Demer stated that he was still in pain, but "his primary condition is still being treated by his psych MD." (*Id.*) Demer also stated that he was to undergo a lumbar epidural procedure on January 26, 2010, to be performed by Dr. Debra Weidman. (Doc 38-1, AR 291-92.) MetLife requested that Demer update his medical information after he underwent the January 26, 2010 procedure. (Doc 38-1, AR 292.) The following is a synopsis of the medical information provided to MetLife in support of Demer's claim for LTD Benefits under the "any occupation" definition of disabled.

### 1. Dr. Debra Weidman

Dr. Debra Weidman, Demer's treating anaesthesiologist, examined him on five occasions between August 25, 2009 and January 26, 2010. (Doc. 37-3, AR 998-1004.) In each physical exam, she noted that Demer was "alert, conversant and oriented x3." (*Id.*) Demer received his first lumbar epidural steroid injection on September 15, 2009. (AR 1002-03.) On December 9, 2010, Demer stated that his lower back and leg pain "definitely responded" to the epidural steroid injection, but he was still bothered by neck pain and headaches. (Doc 37-3, AR 999.) On January 26, 2010, Demer stated that his back and legs are in pain: "He feels that the lumbar epidural steroid injections have given him the most relief and it does seem to last. We had performed 1 injection back in September and it really had not bothered him until just recently. It had not been perfect, but definitely under control." (Doc 37-3, AR 998.) Dr. Weidman conducted a second lumbar epidural steroid injection. (*Id.*) Dr. Weidman noted that Demer seems to have not responded as well to injections with regard to his chronic headache and neck and shoulder pain. (*Id.*) Dr. Weidman's assessment of Demer included: "(1) Low back pain with bilateral radicular extremity pain[;] (2) Cervicalgia with mechanical neck pain[;] (3) Myofascial neck and shoulder pain[;] (4) Chronic headaches, stress and cervicogenic[; and] (5) Long term drug therapy." (*Id.*)

**2. Dr. David Weidman**

Based on an examination conducted September 21, 2009, Dr. David Weidman, Demer's treating neurologist, noted that "lateral bending of the spine actually better than extension, his ability to get into and up from a squat is quite good, he has a strong back, there continues to be mild left more than right cervical paraspinal muscle spasm, and excess straightening in the lumbar region." (Doc. 37-2, AR 985.)  Dr. Weidman wrote:

> I conveyed to Daniel that the number of medicines he is on including Pristiq for mental health reasons, makes chronic pain management from a neurologic standpoint pharamacologically more constrained, but what I can offer are some holistic suggestions.  I think Daniel should invest some time into 10 or 15 minutes of warm-up on his incliner home [sic] preceding initial stages of Yoga exercises, to stretch the body entirely. . . He is also staying active generally as above which is great.

(Doc. 37-2, AR 986.)

In an Attending Physician Statement dated February 3, 2010, Dr. Weidman concluded that Demer could sit intermittently for four to five hours per day, stand intermittently for one to two hours per day, and walk six to seven hours intermittently per day; he could occasionally lift up to ten pounds, but no more. (Doc. 37-2, AR 983.) He opined that Demer could reach above shoulder level and operate a vehicle, but he could not climb, twist, bend and stoop. (*Id.*)  Dr. Weidman noted that Demer could repetitively perform fine finger movement and eye/hand movements, but he could not repetitively push and pull.  (*Id.*)  He commented that Demer's inability to work was due to multiple factors including "chronic pain and depression interacting with each other," and he did not expect improvement in those areas.  (*Id.*)

**3. Dr. Donald Garland**

On February 10, 2010, Dr. Garland, Demer's treating psychiatrist, provided an updated assessment. Dr. Garland determined that Demer suffered from major depression and severe chronic pain syndrome.  (Doc. 37-2, AR 978.)  He stated that Demer's depressed mood caused him to exhibit lower concentration and focus.  (*Id.*)  Dr. Garland opined that Demer may be able to return to work in August of 2010.  (Doc. 37-2, AR 979.)

4. **Dr. Stephen Moore**

Dr. Moore, Demer's primary care physician, provided MetLife with office notes from multiple visits. Dr. Moore began treating Demer in May of 2005. (Doc 37-2, AR 925.) On July 14, 2009, Dr. Moore noted: "The patient and I discussed the MRI findings, and I suggested that his symptoms are probably related to muscular scar or spasm causing radicular symptoms of the peripheral nerves distal to the spinal canal. We discussed the need for massage, stretching, physical therapy, and heat." (DSOF ¶ 34; PRDSOF ¶ 34.) Two weeks later, on July 28, 2009, Dr. Moore described Demer as "doing fairly well" and noted that Demer "is on medical disability leave for one year, but would like to consider getting into teaching." (DSOF ¶ 35; PRDSOF ¶ 35.) On September 18, 2009, Dr. Moore stated, "I believe these headaches are part of his depression and stress response, probably be [sic] muscle contraction. There is no evidence they're migraine, nor does he have any evidence of intracranial pathology." (Doc. 37-2, AR 932.) Dr. Moore also noted that Demer "is attempting to return to school, as he has been laid off from work." (*Id.*)

On March 22, 2010, Dr. Moore examined Demer and prepared an Attending Physician Statement. Dr. Moore noted that Demer had diffuse Degenerative Disc Disease ("DDD") of cervical, thoracic and lumbar spine, severe spinal stenosis and a herniated disc at L3-4. (Doc 37-2, AR 925.) Dr. Moore stated that Demer could continuously sit for one hour per day, stand continuously for less than one hour per day, and walk continuously for less than one hour per day; he could frequently lift up to ten pounds, occasionally lift up to fifty pounds, but never lift more than fifty pounds. (Doc. 37-2, AR 926.) He opined that Demer could reach above shoulder level, operate a vehicle, twist, bend and stoop, but he could not climb. (*Id.*) Dr. Moore noted that Demer could repetitively perform fine finger movement, eye/hand movements, and push and pull movements. (*Id.*) He commented that Demer could work zero hours per day because "chronic pain prevents sitting or standing longer than 30 min[utes] without moving. [Patient] has cognitive limitations [due to] pain as well as analgesics." (*Id.*) Dr. Moore stated that it was unknown whether Demer's condition would

improve in any area.  (*Id*.)   In each visit, Dr. Moore described Demer as "alert, oriented, and [an] appropriately responsive man, in NAD [no acute distress]."  (Doc. 37-2, AR 928- 934.)

### 5.  Dr. Robert C. Osborne

Demer was referred by Dr. Garland to Dr. Osborne in February of 2010.  (Doc. 37-2, AR 922.)   Dr. Osborne's office notes from February 23, 2010 state that Demer was prescribed "Flexorol and Tramadol[;] Morphine (only a few tablets per month)."  (Doc. 37-2, AR 922.) A urine test revealed marijuana and benzodiazepines, which Demer stated he used for pain relief.    (Doc. 37-2, AR 923.)

Based on an examination of Demer conducted May 11, 2010, Dr. Osborne submitted to MetLife an Attending Physician Statement (Doc. 37-2, AR 915-17) in which  Dr. Osborne concluded that Demer could sit intermittently for one hour per day; he could walk and stand intermittently for less than one hour per day; he could never lift any weight up to ten pounds; he could not reach above shoulder level, operate a vehicle, twist, bend, stoop, and climb.  (Doc. 37-2, AR 916.)  Dr. Osborne opined that Demer had a "total disability."  (*Id*.)  Dr. Osborne diagnosed Demer with severe DDD and T 8 compression fracture with symptoms of chronic intractable pain.  (Doc. 37-2, AR 915.)  On June 1, 2010, Dr. Osborne wrote a letter to MetLife, stating "[i]t is my opinion that Mr. Demer has significant medical and psychiatric problems and is absolutely unable to work at the present time and the future.  I needed to clarify this issue for all future communications with your company."  (Doc. 37-1, AR 890.)

### E.   MetLife requests Independent Physician Consultant ("IPC") Review from Dr. Elyssa Del Valle

On June 21, 2010, MetLife forwarded the medical information provided by Demer to Dr. Elyssa Del Valle, Board Certified in Internal Medicine, for her review and assessment of Demer's functional limitations beyond June 18, 2010.  (DSOF ¶ 45; PRDSOF ¶ 45.)  Dr. Del Valle made the following findings:

> The medical information does support functional limitations beyond 6/18/10 due to severe degenerative disc disease, degenerative vertebral disease with numerous levels of the cervical, thoracic, and lumbar spine associated with neural

foraminal narrowing as well as spinal stenosis. The condition is associated with chronic pain necessitating narcotic analgesics despite trigger point injections, cervical and lumbar epidural injections and physical therapy. He has had intervals in which his pain was lessened by these interventions but they were short lived. Since July 2008, the claimant's chronic spinal condition with paravertebral muscle spasm has progressed and would reasonably impact functionality.

There is some inconsistency between the APS [Attending Physician Statement] of Dr. Osborne and Dr. Moore. Dr. Osborne is less familiar with the claimant as the initial encounter was on 2/23/10. . . . The physical capacity noted by Dr. Moore and Dr. Osborne indicate that he can stand, walk and sit no more than an hour each in an 8 hour day. There is no evidence of a level of impairment to this extreme. This would indicate that the claimant is bedridden for more than 20 hours a day. . . .

The APS by the neurologist, Dr. David Weidman is most clearly supported by the medical information in the file. . . . I concur with the restrictions/limitations noted in Dr. Weidman's APS. Although it was dated 4/20/09, there are no clinical data/findings to indicate any change in his overall condition. I concur that the claimant must be restricted from any static positions longer than 30 minutes due to exacerbation of his pain syndrome. It will be important for him to be able to alter positions as often as needed as well as be able to stretch every hour as needed. I do not opine he can walk 7 hours a day, but closer to 3-4 hours intermittently in an 8 hour day. He would need to avoid walking down hill as this would extend his back and exacerbate symptoms related to spinal stenosis. He should avoid any prolonged periods of sitting, standing or walking more than 30 minutes.

The medical indicates that his overall physical status is impacted by his skeletal disease as well as mechanical regarding muscular system. The claimant's mental health issues are likely exacerbated by his physical condition as well.

The restrictions and limitations noted above would be permanent as the claimant has likely reached maximal medical improvement. The goal of treatment will be to maintain his current function.

(Doc. 37-1, AR 884-85). Dr. Del Valle also referenced Dr. David Weidman's findings from an EMG of the upper extremities conducted on July 21, 2009: "The study was normal without evidence of upper cervical radiculopathy on the left. There was no EMG submitted of the lower extremities or reference to one." (Doc. 37-1, AR 883.)

10

**F.     MetLife provides Dr. Del Valle's Report to Demer's Treating Physicians for Comment**

MetLife sent Dr. Del Valle's IPC Report to Plaintiff's treating physicians for their review and comment.  Dr. Osborne submitted a letter on August 24, 2010 which stated, "I have completed most of my examinations.  I have tried to compare them with previous x-rays and MRIs.  I am perplexed by the conclusions reached by Dr. Balle [sic] considering the progressive degenerative changes elucidated by both of the previous x-rays and MRIs as well as the current ones."  (Doc. 37-1, AR 829.)  Dr. Osborne commented that he has "often wondered how one comes up with these calculations such as 'walk five hours, work seven hours' . . . Perhaps a functional capacity evaluation would be helpful in this case?" (Doc. 37-1, AR 830.) Dr. Osborne concluded, "I can only reiterate that my clinical practice validates the significant limitations that I assigned to this gentleman."  (*Id.*)

On August 25, 2010, Demer's attorney sent MetLife a test study performed by Dr. Osborne.  (DSOF ¶¶ 54-55; PRDSOF ¶¶ 54-55.)  After diagnostic evaluation of Demer, Dr. Osborne concluded: the Somato Sensory Evoked Potentials ("SSEP") indicated "a prolongation from the Posterior Tibialis Nerve to the Cerebral Cortex.  This blockage is at the cervical spine level and consistent with other diagnostic studies." (Doc. 39-4, AR 810.)

MetLife forwarded the new diagnostic studies to Dr. Del Valle for her review. (DSOF ¶ 57; PRDSOF ¶ 57.)  On August 31, 2010, after considering Dr. Osborne's supplemental examinations, Dr. Del Valle provided an Addendum to her review.  (Doc. 39-4, AR 812.) Dr. Del Valle found that the "MRI of C spine dated 7/16/10 notes 'no significant change compared to 6/22/09.' The study of the 6/22/09 MRI was noted in my previous IPC review. The only changes noted may be the development of mild neural foraminal narrowing at C6-7. It was noted previously in my review that he has significant DDD with severe changes at C6-7.  The other levels noted 'this is similar to prior exam.'" (*Id.*) Dr. Del Valle explained:

> The additional information indicates continued significant DDD of the cervical and lumbar spine which was noted in my previous review.  The new cervical MRI performed after my 6/21/10 review demonstrates some minor progression, however the radiologist noted as "1) no significant change compared to 6/22/09".  The SSPE study was helpful to determine presence of

11

radioculopathy, however this was an [sic] expected given the findings on lumbar MRI from August 2008. SSPE is however limited as it cannot determine etiology or determine treatment. It cannot determine progression as there are no previous studies to compare. Additionally, it cannot be used to determine his clinical functionality. It is unknown why he has not had another evaluation with MRI of the lumbar spine over the past 2 years. It may be due to the fact he has done well with the epidural injections. If he was deemed incapable of walking more than an hour per Dr. Osborne's APS, it would seem to warrant neurosurgical intervention or at least evaluation by neurosurgery for possible decompression. Again, there is no study provided that indicates any particular change in his lumbar spine condition since August 2008. I do opine that the SSPE does indicate ongoing nerve compression which warrants additional evaluation as to direct optimal care.

As Dr. Osborne commented, it is unknown what his functional capacity is regarding how much he can walk, stand and sit as there has been no functional capacity exam performed. Despite this, I do concur that the claimant is functionally impacted as noted in my previous review. I still contend it is reasonable for the claimant to be capable of using his hands, fingers without limitations. This is supported by normal upper extremity EMGs on 7/21/09 as well as no evidence of atrophy or loss of muscle tone of the upper extremities, hands and fingers. Thorough physical exam in February 2010 by Dr. Osborne noted normal motor strength of his extremities. I continue to opine he could be capable of sit/stand and walk with no static positions of more than 30 minutes. . . . I do opine he is unable to walk, stand for any prolonged periods due to severe Lumbar DDD. He was able to perform his job duties at the time the MRI was performed on 8/26/08. There is no documentation to indicate any progression in his lumbar disease that would preclude his ability to walk and stand with accommodations to change positions as needed. . . .

As for the diagnosis of migraines, this condition would impact his ability to work during an acute migraine attack. . . . [T]here is no clinical data/finding to indicate continual functional impairment beyond 6/18/10 due to migraines. . . .

Summary of reasonable R/Ls [Restrictions/Limitations] are as follows based on the medical received: . . . I would alter my previous opinion regarding walking/standing from Dr. Weidman's opinion to walk 2 and stand 2 in an 8 hour work day. He should be capable of sitting 4-6 hours per day as long as he has proper ergonomics at work desk and can change positions as needed for comfort. . . . He has earned teaching credentials this past spring indicating his goals include activities consistent with the above R/Ls. He should be encouraged rather than restricted from activities of ADLs [Activities of Daily Living]. These restrictions/limitations would meet the level to perform ADLs and work duties with the above accommodations.

(Doc. 39-4, AR 813-15.)

**G.   MetLife Denies Demer Benefits Under "Any Occupation" Definition of Disability**

Utilizing the findings of Dr. Del Valle, MetLife conducted an Employment Assessment and Labor Market Analysis ("LMA").  (Doc. 39-4, AR 785-77.)  The analysis concluded:

> Mr. Demer has transferable skills for other occupations as based on his training, education, and experience.  He has the ability to work at the sedentary to light level of physical exertion with the restrictions and limitations as stated above in the MEDICAL HISTORY section.  An Employment Assessment and LMA were performed which identified four occupations for which Mr. Demer is qualified and which are found to exist in his geographical area.  Additionally, a search using Indeed.com indicated job openings for the above identified occupations.

(Doc 39-4, AR 787.)

On October 1, 2010, MetLife sent Demer a seven page letter detailing MetLife's review of his LTD benefits claim and supporting medical information.  (Doc 39-4, AR 776-82.)  Among other things, MetLife found:

> The medical information on file does support functional limitations due to severe degenerative disc disease, degenerative vertebral disease with numerous levels of the cervical, thoracic and lumbar spine.  The chronic pain associated with the conditions necessitates narcotic analgesics despite trigger point injections, cervical and lumbar injections and physical therapy.
>
> The restrictions and limitations provided by Dr. Osborne and Dr. Moore are severe and would indicate that you are bedridden 20 hours a day.  Medically supported restrictions were determined as follows by an independent physician: Change position every 30 minutes, walk 3-4 hours intermittently in an 8 hour day, avoid walking downhill, avoid prolonged periods of sitting, standing or walking for more than 30 minutes. . . .
>
> In summary, the medically supported restrictions and limitations per a[n] Independent Physician Reviewer are as follows:
>
> No lifting more than 25 pounds and no frequent lifting more than 10 pounds.  No frequent overhead work, limited climbing, twisting and stooping.  No prolonged sitting or any static positions more than 30 minutes.  No prolonged walking or standing for more than 30 minutes. Sitting 4-6 hours per 8 hour day with proper ergonomics and the ability to change position as needed. . . .

13

> Based on this information, you should be able to perform at the sedentary to light level of physical exertion as defined by the U.S. Department of Labor. . . .
>
> The results of our employment analysis support the vocational conclusion that suitable vocational alternatives potentially exist in reasonable numbers in your local economy, and these occupations will provide earnings at the gainful employment level.  According to your LTD plan, gainful employment is defined as occupations that you are reasonably qualified based on your education, training, experience, and functional ability, and provides gainful wages of $4,240.48 per month or $24.46 hourly.

(Doc. 39-4, AR 778-81.)  MetLife thus determined that Demer was not disabled within the meaning of the Plan and terminated his benefits in October 2010.  (Doc. 39-4, AR 781-82.)

## H.   Demer's Appeal of MetLife's Termination of Benefits

On March 28, 2011, Demer filed an appeal with MetLife.  (DSOF ¶ 68; PRDSOF ¶ 68.) The appeal made no mention of Demer's depression, but  attempted to rebut Dr. Del Valle's medical opinion with opinions from Dr. Osborne.  (*Id.*)  In the appeal, Demer argued that MetLife failed to consider the effect of his medications on his job performance.  (DSOF ¶ 71; PRDSOF ¶ 71.)

Dr. Osborne submitted to MetLife a Review and Criticism of the MetLife determination of October 1, 2010 and the IPC review by Dr. Del Valle.  (Doc 39-3, AR 720-23.) Dr. Osborne asserted that a comparison of the MRIs of 6-22-09 and 7-16-10 demonstrated that Demer's disease had progressed.  (Doc. 39-3, AR 721.) He also explained that the SSPE of the Posterior Tibial Nerve was ordered "to eliminate foraminal narrowing L5 and review the spinal nerve conduction from a different branch of the sciatic nerve."  (*Id.*) The results of the SSPE "obviate[d]  the previous L5 (Extensor Digitorum Brevus) consideration as the sole nerve deficit."  (*Id.*)  Dr. Osborne stated that "the overall picture is one of a gentleman with severe spinal deterioration at all components of the spine as well as neurophysiological evidence of a delayed conduction (spinal cord problem) of the bilateral Posterior Tibial Nerves to the cerebral cortex as well as a separate left L5 nerve root legion."  (Doc. 39-3, AR 721-22.)  To treat Demer's condition, chronic narcotic medication had been prescribed, which Dr. Osborne opined has side effects that "limit the ability to complete

14

productive mental functions." (Doc. 39-3, AR 722.) Dr. Osborne thus concluded, "It is also my consideration that Mr. Demer will never again be able to complete a gainful employment or occupation." (*Id.*)

MetLife referred Demer's medical information, including Dr. Osborne's comments regarding the effects of [Demer's] pain medications, to Medical Consultants Network ("MCN") to determine whether "there was clinical evidence to support restrictions and limitations and/or side effects resulting from the medications taken" by Demer. (DSOF ¶ 74; PRDSOF ¶ 74.)   MCN contracted with Marcus Goldman, M.D., Board Certified in Psychiatry, who prepared a written opinion based on a "page-by-page review of [the] 400-page record." (Doc. 39-2, AR 664-65.)   In response to the question, "[d]oes the medical information support (psychiatric) functional limitations beyond 10/29/2010," Dr. Goldman answered that "claimant is not seen with a frequency or intensity that would be deemed appropriate for the level of afunctionality reported by the claimant's providers." (Doc. 39-2, AR 668.)   Dr. Goldman explained:

> [t]he claimant is not objectively noted to be obtruded, lethargic, or with altered sensorium or intoxication.   At no time was there any data to support significant cognitive dysfunction in any quantified or otherwise objective fashion.   While Dr. Osborne suggested that the claimant is using marijuana, there [is] no data detailing the specifics of the claimant's use.   There is no mention of chemical dependency assessment, for example.

(*Id.*) He also noted that "[g]iven the lack of recent data and the paucity of any compelling objective findings, as well as the lack of serial mental status examinations, this reviewer would be unable to establish the presence of an impairing mental condition." (*Id.*) MetLife also asked Dr. Goldman to opine  whether "there is clinical evidence to support restrictions and limitations and/or side effects resulting from the medications taken by this claimant, from beyond 10/29/2010." (Doc. 39-2, AR 668.)   Dr. Goldman responded: "Beyond October 29, 2010, there clearly are no objective or other compelling or convincing data to establish functional impairment as a result of Mr. Demer's psychotropic medications." (*Id.*)

MetLife also referred Demer's medical file and supporting documentation for LTD benefits to Dennis S. Gordan, M.D., Board Certified in Physical Medicine and Rehabilitation,

Board Certified in Internal Medicine. Dr. Gordan prepared an eighteen-page review; twelve pages were devoted to summarizing the treating physicians' findings and Demer's medications. (Doc. 39-2, AR 645-63.)

Dr. Gordan attempted to speak with Demer's treating physicians, including Dr. Osborne. (Doc. 39-2, AR 661-62.) After multiple attempts to contact Dr. Osborne, Dr. Gordan was informed by a woman named Beth that Dr. Osborne stated that he did not wish to speak with him and planned to "let the affair go to trial." (Doc. 39-2, AR 661.) Dr. Gordan informed Beth that it was his opinion that Demer "did not have migraine headaches, and that the evoked potentials and electrodiagnostic testing were not indicative of either myelopathy or radiculopathy, so that if Dr. Osborne wanted to call back to discuss this, that would be fine." (*Id.*)

On April 13, 2011, Dr. Gordan spoke with Dr. David Weidman, who informed Dr. Gordan that the last time he had seen Demer was in January 2010. (Doc. 39-2, AR 662.) Dr. Weidman stated that "he had not ordered somatosensory evoked potentials for quite some time, since he found that they did not add anything beyond other testing. . . . He had not ever thought that the claimant had migraine headaches." (*Id.*)

Also on April 13, 2011, Dr. Gordan spoke with a supervisor named Dave from the neurophysiology lab where the somatosensory evoked potentials had been done. (Doc. 39-2, AR 663.) "Dave indicated that, although not on the report, nerve conduction test had been done when the evoked potentials were performed, and the conduction velocities were decreased. He also said that the delay in the P40 wave could be from peripheral neuropathy, radiculopathy, or some cord lesion." (*Id.*)

On April 15, 2011, Dr. Gordan spoke with Dr. Moore. (Doc. 39-2, AR 662.) Dr. Gordan's note indicate that Dr. Moore related:

> [H]is nurse practitioner had seen the claimant twice and he had seen him once (1/24/11) during the period in question. Dr. Foote, the neurologist who had conducted the EMG, had seen the claimant on 2/21/11, at which point Dr. Foote wrote that the claimant appeared to have muscle contraction headaches. Dr. Foote also wrote that the claimant had demonstrated an Allman neuropathy on EMG on one occassion and had a question of

lumbar radiculopathy on another EMG.  The claimant had also been seen by Dr. Baron, an orthopedic surgeon, on 10/29/10. Dr. Baron thought the claimant had cervical and lumbar degenerative joint disease and radiculopathy, and spinal stenosis in the neck at least, for which he thought lumbar decompression had a decent chance of yielding improvement, but cervical surgical prognosis was guarded.  Dr. Moore said that when the claimant was seen in January, he had difficulty walking into the office and was taken in by wheelchair to the examining room. As far as he knew, the claimant could do a very sedentary job, but he felt that he would have to see him again to say that definitely.  He recognized that depression and chronic pain syndrome were playing roles in the claimant's total symptomatology.

(*Id.*)

MetLife asked Dr. Gordan to answer the following question after a review of Demer's medical file and interviews with Demer's treating physicians: "Do the physical conditions alone, and or combined result in continuous physical functional impairment, and restrictions and limitations (temporary or permanent), specific to the period beyond 10/29/10, as supported by clinical findings?" (Doc. 39-2, AR 650.)  Dr. Gordan answered:

The claimant has headaches and multiple areas of pain, with documented anatomical cervical spinal stenosis, degenerative disc disease, and degenerative facet disease of the spine, as well as degenerative arthritis of the left hip, status post some type of hip procedure.  There has been, however, no evidence of sphincter dysfunction, long tract signs, or intrinsic cord signal abnormalities to suggest that spinal stenosis had yielded cervical myelopathy.  Dr. Osborne's interpretation of the evoked potential and electrodiagnostic testing is incorrect.  The prolongation of the P40 wave, taken alone, says only that there is delay in conduction somewhere between the stimulation site in the leg and the brain.  Given the slowed peripheral nerve conduction reported to me by the testing lab, it is even less clear what caused the prolongation.  If the claimant had an L5 radiculopathy, as Dr. Osborne asserts, there would be yet another reason for prolongation, but the lower limb electrodiagnostic testing does not even claim to clearly demonstrate a radiculopathy, conceding that the fibrillations in the extensor digitorum brevis could be from neuropathy or a root lesion. Single muscle abnormalities, however, should never be attributed to radiculopathy [especially, but also to neuropathy], and this is doubly so in the extensor digitorum brevis, which is notoriously frequently damaged locally by trauma. . . .

The claimant does have headaches, but as everyone except Dr. Osborne has said, these appear to be muscle contraction headaches.  Dr. Osborne's statement about overwhelming

17

> migraines has no basis.  His assertion that the trigeminal nucleus was the etiology for cervicogenic headache was at odds with the neurologist's assessment and appears specious. . . .
>
> In summary, the claimant likely has a modicum of discomfort from muscle contraction headache, neck and back pain related to spinal degeneration, and referred pain down the limbs from those degenerative changes.   His own assessments of his capabilities would be adversely affected by his depression, but he would appear to be capable of sitting for an hour at a time, with short breaks for stretching, and up to 7 hours a day, standing and walking for 15 minutes at a time and up to 2 hours a day, lifting up to 10 pounds frequently, 20 pounds occasionally and 35 pounds rarely; occasionally twisting, bending, stooping, and reaching above shoulder level, driving, and doing repetitive movements with either hand.  He could occasionally climb stairs only.

(Doc. 39-2, AR 650-51.)  MetLife also asked the doctor to opine "whether there is clinical evidence to support restrictions and limitations and/or side effects resulting from the medications taken by this claimant, from beyond 10/29/2010."  (Doc. 39-2, AR 651.)  Dr. Gordan answered, "[t]here is no specific information about medications taken or effects from them during the period in question.  Although Dr. Osborne asserted that the claimant's needed narcotic medication caused cognitive side effects, there was never any evidence of that."  (*Id.*)

On May 6, 2011, after reviewing "Mr. Demer's entire claim," Metlife sent Demer a letter affirming its decision to terminate Demerr's benefits beyond October 29, 2010.  (Doc. 39-1, AR 514-20.)  MetLife noted among its findings, that "[a] cervical spine magnetic resonance imaging (MRI) done [sic] completed on July 16, 2010 showed no significant changes compared with the June 22, 2009 cervical spine MRI."  (Doc. 39-1, AR 515.)  The letter concluded:

> Based on our review of the information provided, we have determined there was insufficient information to support any restrictions or limitations that would deem Mr. Demer unable to work in any gainful occupation for which he is qualified taking into account his training, education and experience. The medical information in totality does not support any physical or psychiatric restrictions or limitations that would have precluded Mr. Demer from performing any occupation beyond October 29, 2010, and therefore, the previous decision to terminate LTD benefits for the time period in question was appropriate and remains in effect.

(Doc. 39-1, AR 519.)[2]

## DISCUSSION

The purpose of ERISA is "to protect ... the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts." 29 U.S.C. § 1001(b). 29 U.S.C. § 1132(a)(1)(B) provides that a participant in an employee benefit plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." Demer initiated this action pursuant to ERISA seeking disability benefits under IBM's long-term disability plan.

## STANDARD OF REVIEW

The district court reviews a denial of plan benefits "under a *de novo* standard" unless the plan provides to the contrary. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Where the plan provides to the contrary by granting the administrator or fiduciary discretionary authority to determine eligibility for benefits, a deferential standard of review is appropriate. *Id*. Deference means that a plan administrator's interpretation of the plan "will not be disturbed if reasonable." *Conkright v. Frommert*, 559 U.S. 506, 521-22 (2010). Under the reasonableness standard, a plan administrator abuses its discretion when its determination is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Salomaa v. Honda Long Term Disability Plan*, 642

---

[2]The Court will not consider the additional medical documentation Demer submitted to MetLife after its final decision because the documentation was not provided to or considered by MetLife prior to MetLife's final denial of Demer's LTD claim. *See Abatie v. Alta Health & Life Ins Co.*, 458 F.3d 955, 970 (9th Cir. 2006) ("in general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion. . ."); *see also Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 632 n.4 (9th Cir. 2009) ("In the ERISA context, the 'administrative record' consists of 'the papers the insurer had when it denied the claim.'") (citation omitted).

F.3d 666, 675-76 (9th Cir. 2011).  To find an abuse of discretion, the court must be left with a "definite and firm conviction that a mistake has been committed."  *Id*. at 676.  Where the plan administrator both pays benefits and determines eligibility for those benefits, the abuse of discretion standard still applies.  *See Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008).  A plan administrator's conflict of interest is a factor that the Court must weigh in determining whether the plan administrator's denial of benefits was reasonable.  *Id*. at 117.

In this case, the Plan provides MetLife discretionary authority to determine eligibility for LTD benefits, and MetLife's "discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious." (Doc. 36-3, AR 116.) Thus, the Court will review MetLife's denial of benefits  for abuse of discretion.[3] Under the abuse of discretion standard, the Court will analyze the effect, if any, MetLife's conflict of interest had on its determination to deny Demer LTD benefits.

The Court's review is generally limited to the Administrative Record.  *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006).  The Court, however, may consider evidence outside the Administrative Record as it pertains to the conflict of interest factor.  *Id*.

## ANALYSIS

Plaintiff challenges MetLife's denial of benefits on two grounds: (1) MetLife operated under a conflict of interest which caused it to unreasonably deny Plaintiff's claim; and (2) MetLife's decision was arbitrary and not supported by the evidence in the record.  After considering MetLife's structural conflict of interest and the Administrative Record, the Court finds that MetLife's denial of LTD benefits was reasonable.

In determining the scope of MetLife's conflict of interest, the Court examines several factors including history of biased claims administration, evidence of procedural

---

[3] Where the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.  *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

unreasonableness, emphasis on medical reports favoring denial coupled with de-emphasis of reports suggesting a contrary conclusion, failure to provide independent vocational and medical experts with all of the relevant evidence, and the ultimate adequacy of the record's support for the agency's factual conclusion. *See Glenn*, 554 U.S. at 118.  In the present case, Demer contends that MetLife's conflict of interest is demonstrated by its history of claims administration, its emphasis on medical reports favoring denial coupled with de-emphasis of reports suggesting a contrary conclusion, and the ultimate lack of support for the agency's factual conclusion.  Because the second and third of these factors necessitate a review of MetLife's decision on its merits, the Court will consider them in the context of Plaintiff's claim that MetLife's decision was arbitrary and not supported by the evidence in the record.

**A.   MetLife's alleged history of claims administration does not demonstrate that MetLife operated under an impermissible conflict of interest in this case**

Demer contends that MetLife has a history of biased claims administration and therefore the Court should conclude that MetLife operated under an impermissible conflict of interest in denying Demer's claim.  In support of this argument, Plaintiff offers citation to cases holding that MetLife acted in a capricious and arbitrary manner.  The Court finds such citation minimally probative to substantiate a claim that the administrator has a history of biased claim determinations. *See Watts v. Metropolitan Life Ins. Co.*, 2011 WL 1585000, *13 (S.D. Cal. April 26, 2011) ("a history of biased claims administration is not evidenced by mere citation to specific decisions criticizing claim determinations.")  For the years 2009 through 2011, MetLife received a total of 917,203 claims; Plaintiff's citation to a handful of opinions - not including opinions upholding MetLife's denial of benefits - fails to convey a history of biased claims handling. *Cf Glenn*, 554 U.S. at 117 (finding evidence of history of biased claims administration in a law review article summarizing one insurance company's history).

In addition, the Court notes that a plan administrator's structural conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." *Id*. at 117.  The Court

finds that MetLife has taken affirmative steps to reduce potential bias and promote accurate claim determinations.[4]   MetLife walls off its claims department from its financing department.  (DSOF ¶ 90.)  The claims and appeals specialists do not report to, and are geographically separate from, the finance department.  (*Id*.)  MetLife's finance department employees do not make, direct or have any association with claims decisions.  (DSOF ¶ 91.) Metlife's claims and appeals specialists receive no financial benefit or performance recognition based upon either the value or number of claims they deny or terminate.  (DSOF ¶ 92.)  Under the Plan, IBM could determine in any Plan year to self-fund benefits, yet MetLife would still act as claims administrator.   (DSOF ¶ 94.)  Of the group disability claims received by MetLife, only a small percentage of claims are sent to IPCs or other third-party vendors that retain IPCs to perform independent reviews.  (DSOF ¶ 95.)  Based on information available for the years 2009 through 2011, MetLife sent 33,248 referrals of claims for group disability benefits for independent medical review, which included not only initial referrals but referrals for addendum opinions.  (*Id*.)  Based on information available for the years 2009 through 2011, MetLife received a total of 917,203 claims for group disability benefits; MetLife approved for payment of benefits a total of 750,916 claims, thus denying 176,133 claims.  (DSOF ¶ 96.)

Moreover, the Court finds that the Social Security Administration's ("SSA") determination supports MetLife's review of the medical evidence.   Demer submitted a

---

[4] Plaintiff  objects to DSOF ¶¶ 90-96, contending that the declarations of Gregory Hafner and Laura Sullivan were not timely disclosed, and therefore should not be considered.  (PRDSOF ¶ 90.)  Demer asserts that consideration of these documents will prejudice him because late disclosure eliminated his opportunity to conduct discovery and examine the accuracy of these statements.  (*Id*.)  Plaintiff's claim that he did not have an opportunity to conduct discovery into this matter is specious.  As an appeal from an administrative record, this case is exempt from disclosure requirements.  *See* Fed. R. Civ. P. 26(a)(1)(B)(i).  Nonetheless, in Plaintiff's initial Rule 26(a)(1) disclosure statement, he expressed his intent to take Rule 30(b)(6) depositions of MetLife to discover whether MetLife had procedures in place that could lead to evidence of bias in its claim handling process.  (Doc. 44-1, Exh. B at p. 2.)  Plaintiff failed to conduct such discovery.  Notably, the Ninth Circuit has stated that a conflicted administrator "may find it advisable to bring forth affirmative evidence that any conflict did not influence its decision making process."  *Abatie*, 458 F.3d at 969.  The Court will therefore take into consideration the affidavits submitted by MetLife concerning its efforts to ameliorate its structural conflict of interest.

disability claim to the SSA.  The claim was not decided by a Administrative Law Judge but by "trained staff."  (PRDSOF ¶ 67; DCSPSSOF ¶ 93.)  The SSA concluded the following: "While you do experience pain and discomfort due to your physical condition, the medical evidence shows you are able to move about.  You are able to walk without assistance and to use your arms and legs in a satisfactory manner.  The evidence shows your headaches are controlled with medication."  (DSOF ¶ 67; DCSPSSOF ¶ 93.)  Although not a decision by an administrative law judge, the SSA's findings support the objectivity of MetLife's review of the medical evidence.  Accordingly, the Court concludes that MetLife's structural conflict of interest did not influence its decision to deny Demer's claim.

**B.    In denying Demer's claim, MetLife did not overly emphasize medical reports favoring denial or reach a conclusion which lacked support in the record**

Demer claims that MetLife's decision to deny benefits was arbitrary and capricious because it relied on the biased opinion of Drs. Del Valle, Gordan and Goldman.  The Court concludes that these doctors were not influenced by bias and that MetLife properly reviewed the evidence in Demer's medical file and considered the medical opinions that supported a finding of disabled.[5]

### 1.    Dr. Del Valle's opinion

Plaintiff contends that Dr. Del Valle agreed with many of the treating physicians diagnoses, but refused to find that Demer was disabled.  Plaintiff concludes that this result can only be explained by Dr. Del Valle's desire to please her employer.[6]  The Court

---

[5] In so concluding, the Court rejects Demer's implication that medical professionals retained by MetLife are always biased.  The Court notes that MetLife approved Demer's claim for LTD benefits under the "own occupation" definition of disabled based on Dr. Gosline's assessment.  Dr. Gosline was an IPC retained by MetLife similiar to Dr. Del Valle, Dr. Goldman, and Dr. Gordan.

[6] Plaintiff disputes Dr. Del Valle's independence from MetLife.  (PSOF ¶ 15.) Plaintiff notes that during calendar year 2010, Dr. Del Valle prepared 215 reports and 47 addendums for MetLife, and earned $137,403.75.  (PSOF ¶ 15.)  In 2009, Dr. Del Valle earned $167,640.00.  (PSOF ¶ 16.)  From January 11th to May 11th of 2011, Dr. Del Valle earned $52,346.25.  (*Id.*)  Defendants rebut Plaintiff's assertion that Dr. Del Valle is biased, noting that Dr. David Weidman considered her IPC report to be a "very fair assessment."  (Doc 38-4, AR 462.)  The Court does not consider Dr. David Weidman's statement with respect to the merits of Demer's disability claim, but rather, as evidence to rebut Plaintiff's contention that Dr. Del Valle operates under a conflict of interest.  *See*

1   disagrees.  Dr. Del Valle found that the medical information supported functional limitations

2   beyond 6/18/10 due to "severe degenerative disc disease, degenerative vertebral disease with

3   numerous levels of the cervical, thoracic, and lumbar spine associated with neural foraminal

4   narrowing as well as spinal stenosis."  Based on this diagnosis, Dr. Del Valle concluded that

5   Dr. David Weidman's opinion as to Plaintiff's functional capacity was the opinion best

6   supported by the medical evidence *despite the fact that it was dated 4/20/09*.  Dr. Del Valle

7   also submitted an addendum to her report after reviewing new medical information and

8   objections to her report submitted by Dr. Osborne.   She found that the cervical MRI

9   conducted 6/21/10 showed "some minor progression" of Demer's condition when compared

10  to the 6/22/09 MRI, but not so drastic as to support a finding of disabled within the meaning

11  of the Plan.   Dr. Del Valle found that no study provided for her review indicated "any

12  particular change in his lumbar spine condition since August 2008."  Dr. Del Valle concluded

13  that Demer was able to perform his duties at IBM in August of 2008, and his functional

14  capacities had not deteriorated to the extent that he would be physically incapable of working

15  at the time of her review.   Dr. Del Valle considered all the treating physicians's opinions.

16  She did not scan the record and cherry pick evidence that was probative of denying Demer's

17  disability claim.   Moreover, Dr. David Weidman considered Dr. Del Valle's IPC report to

18  be a "very fair assessment."

19          **2.     Dr. Gordan's opinion**

20          Plaintiff also asserts that MetLife relied on the biased opinion of Dr. Gordan to deny

21  Demer's appeal.   Specifically, Plaintiff contends that Dr. Gordan failed to diagnose Demer

22  with radiculopathy and acknowledge the side effects of Demer's medications, which was

23

24

25

26

27

28  *Abatie,* 458 F.3d at 970 ("The district court may, in its discretion, consider evidence
    outside the administrative record to decide the nature, extent, and effect on the
    decision-making process of any conflict of interest.")

24

contrary to the medical evidence.[7] The Court finds that Dr. Gordan's  conclusions were not the result of bias.

Dr. Gordan did not diagnose Demer with radiculopathy, although it was diagnosed by Dr. Osborne, Dr. Debra Weidman, Dr. Moore, Dr. Baron, and Dr. Del Valle.  The Court, however, does not conclude that this demonstrates that Dr. Gordan issued a biased opinion. Dr. Gordan spoke with a supervisor from the neurophysiology lab where the SSPE was conducted and received information that a nerve conduction test had also been done when the evoked potentials were performed which could indicate peripheral neuropathy, radiculopathy, or some cord lesion.  Dr. Foote, who conducted the EMG on 2/21/11, determined that Demer had an Allman Neuropathy and stated there was a question of lumbar radiculopathy on another EMG.  Dr. David Weidman conducted an EMG on July 21, 2009 of Demer's upper extremities and found that "[t]he study was normal without evidence of upper cervical radiculopathy on the left.  There was no EMG submitted of the lower extremities or reference to one."  In sum, Dr. Gordan's medical opinion differs from several of the treating and reviewing physicians, but the objective medical tests spawned various diagnoses and created room for disagreement.  Dr. Gordan attempted to speak with Dr. Osborne concerning his contrary diagnosis but Dr. Osborne declined.  Plaintiff's reviewing physician denied Dr. Gordan an opportunity to potentially revise his diagnosis.  Nevertheless, Dr. Gordan did diagnose Demer with DDD, slowed nerve conduction, chronic pain, and headaches.  However, similar to Dr. Del Valle, he found that these diagnoses did not render Demer disabled.

_____

[7] Plaintiff disputes Dr. Gordan's independence from MetLife.  (PSOF ¶ 23.)  In calendar years 2009 and 2010, Dr. Gordan earned from MetLife $182,137.50 and $212,775.00, respectively.  From January 11th to May 11th, he earned $61,275.00.  (Id.) Plaintiff also asserts that Dr. Gordan is the same Dr. Gordon from *Mohamed v. MetLife*, 2012 WL 315868 (S.D.N.Y. decided February 2, 2012).  (Doc 29-2, Exh. 8, Affidavit of Plaintiff's counsel, Barry Kirschner.)    Defendants dispute that the doctor in that case is the same Dr. Dennis Gordan here.  Defendants further contend that the affidavit relies on double hearsay, and therefore must be stricken.  The court has read *Mohamed*, and finds that regardless of the hearsay issue, Dr. Gordan's determinations in that matter are minimally probative, if at all, of his opinion in this matter, especially in light of the volume of work he does for MetLife.

MetLife also asked Dr. Gordan if there was any "clinical evidence" to support restrictions and limitations resulting from Demer's medication.  Plaintiff cites as evidence of bias Dr. Gordan's answer: "There is no specific information about medications taken or effects from them during the period in question.  Although Dr. Osborne asserted that the claimant's needed narcotic medication caused cognitive side effects, there was never any evidence of that."  Dr. Gordan detailed Demer's history of prescribed and non-prescribed medications, which included powerful pain narcotics.  He admitted that Demer suffers from multiple areas of pain with documented anatomical cervical stenosis, DDD, delayed nerve conduction, headaches, and arthritis.  He did not find specific information to support cognitive side effects from Demer's medications.  Plaintiff asserts that the opinions of Drs. Osborne and Moore and Demer's written statement undermined Dr. Gordan's opinion.  Dr. Osborne noted that side-effects to be expected from Demer's medications were narcotic related fatigue and decreased ability to concentrate.  (Doc 39-3, AR 722-23.)  Dr. Moore stated that Demer had "cognitive limitations," but he did not explain what the limitations were or the cause.  (Doc. 37-2, AR 926.)  Demer's personal statement submitted to MetLife provided that his medications caused him fatigue and affected his concentration.  (Doc. 39-3, AR 729.)  However, Demer's treating physicians - Drs. Moore, Debra Weidman, and David Weidman - consistently described him as alert, oriented, and appropriately responsive.  Dr. Gordan's answer was supported by the medical evidence.

### 3.    Dr. Goldman's opinion

MetLife requested Dr. Goldman review Demer's mental heath issues, including the side effects of his medication.  (Doc. 34, p. 26.)  As to Dr. Goldman, Plaintiff contends that he failed to consider the opinions of Drs. Moore and Osborne as to Demer's cognitive limitations and ignored the statements made by Demer and lay witnesses who observed Demer's condition worsen.  Plaintiff similarly challenges the objectivity of Dr. Goldman's opinion and MetLife's reliance upon it.  To establish Dr. Goldman's bias, Plaintiff primarily relies on Dr. Moore's note that Demer "has cognitive limitations [due to] pain as well as analgesics," and Dr. Osborne's letters dated February 14, 2011 and February 17, 2011,

26

wherein he describes, in general, the side effects expected from the medications Plaintiff had been prescribed.

In each of his examinations with Dr. Moore and Dr. Debra Weidman, Demer was described as alert, conversant and oriented x3.  Dr. David Weidman and Dr. Moore both noted that Demer wanted to become a teacher.  Dr. David Weidman, in particular, encouraged Demer to seek a more holistic approach to pain relief including yoga.  Dr. Goldman found that there were no objective findings that Plaintiff acted "obtruded, lethargic or with altered sensorium or intoxicat[ed].  At no time was there any data to support significant cognitive dysfunction in any quantified or otherwise objective fashion."  Dr. Goldman reviewed the 400 page record, noted the lack of objective evidence, and determined that the evidence provided was insufficient to support a cognitive impairment that would render Demer disabled.  It was plaintiff's burden to provide MetLife with evidence of cognitive dysfunction.  *See Morales-Alejandro v. Medical Card System, Inc.*, 486 F.3d 693, 700 (1st Cir. 2007) ("A claimant seeking disability benefits bears the burden of providing evidence that he is disabled within the plan's definition").  The lack of medical evidence to support a cognitive disability is not evidence of Dr. Goldman's bias.

Plaintiff also asserts that his statements as well as lay persons' observations were not taken into consideration by Dr. Goldman.  The Court finds that there is no evidence that affirmatively states whether Dr. Goldman considered the statements.[8]  However, the Court notes that MetLife denial letter states, "we have reviewed Mr. Demer's entire claim."  Dr. Goldman also stated he conducted a "page-by-page review of this 400-page record."

---

[8]Plaintiff cites *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1120-21 (10th Cir. 2006), for the proposition that an administrator acts arbitrarily by dismissing statements made by lay people closely associated with the claimant.  In that case, two of claimant's relatives filed affidavits detailing claimant's cognitive and physical impairments.  The administrator stated that the affidavits "were not considered in making our determination."  The court found that the administrator acted in an arbitrary manner by failing to give full and fair consideration to the affidavits.  *Id.* at 1121. Here, MetLife made no such concession.

27

### C.    MetLife's decision was supported by the record

The Plan provides that Plaintiff is entitled to LTD benefits if "because of a sickness or injury, [he] cannot perform the important duties of any other gainful occupation for which [he is] reasonably fit by [his] education, training, or experience."  MetLife concluded that Plaintiff did not meet this standard because "the medical information in totality does not support any physical or psychiatric restrictions or limitations that would have precluded Mr. Demer from performing any occupation beyond October 29, 2010. . ."  MetLife's denial of Plaintiff's LTD benefits is supported by the record and therefore constitutes a reasonable determination.

Dr. Debra Weidman examined Demer on five occasions from August 25, 2009 to January 26, 2010, and in each physical exam, she noted that he was "alert, conversant and oriented x3."  Demer received his first lumbar epidural steroid injection from Dr. Debra Weidman on September 15, 2009 and stated that his lower back and leg pain "definitely responded" to the epidural steroid injection.  On January 26, 2010, Dr. Debra Weidman conducted a second lumbar epidural steroid injection, and she noted that "[w]e had performed 1 injection back in September and it really had not bothered him until just recently.  It had not been perfect, but definitely under control."

Dr. David Weidman examined Plaintiff on September 21, 2009 and noted that he could get into and up from a squat quite well and he had a strong back.  Dr. David Weidman recommended that Plaintiff practice yoga exercises and noted that he "was staying active . . . which is great."  In an Attending Physician Statement, Dr. David Weidman opined that Plaintiff could sit intermittently for four to five hours per day, stand intermittently for one to two hours per day, and walk six to seven hours intermittently per day; he could occasionally lift up to ten pounds, but no more; he could reach above shoulder level and operate a vehicle, but he could not climb, twist, bend and stoop; and he could repetitively perform fine finger movement and eye/hand movements, but he could not repetitively push and pull.  In addition, Plaintiff's treating psychiatrist, Dr. Garland, opined that Demer could possibly return to work in August of 2010.

The findings most favorable to Plaintiff's disability claim were made by Dr. Moore and Dr. Osborne.  Dr. Moore, however, noted in each visit that Plaintiff was "alert, oriented, and [an] appropriately responsive man, in NAD [no acute distress]."  Dr. Moore also noted that Plaintiff wanted to start teaching.  On March 22, 2010, Dr. Moore examined Demer and prepared an Attending Physician Statement, concluding that Plaintiff could work zero hours per day because "chronic pain prevents sitting or standing longer than 30 min[utes] without moving. [Patient] has cognitive limitations [due to] pain as well as analgesics."  Dr. Osborne found that Plaintiff could never lift any weight up to ten pounds; he could not reach above shoulder level, operate a vehicle, twist, bend or stoop.  Thus, Dr. Osborne concluded that Plaintiff had a "total disability."  Dr. Osborne's opinion that Plaintiff could not operate a vehicle was directly contradicted by Plaintiff's conversations with MetLife on January 14, 2010 and May 18, 2010, where he stated that he had been driving a vehicle.  Further, while receiving disability payments, Demer told a MetLife claims representative that "he was just completing online courses."  Thus, he worked and focused on course material while he was disabled.[9]

Dr. Del Valle reviewed Demer's medical record.  She noted inconsistencies between the opinions of Drs. Osborne and Moore, and rejected both of their assessments of Plaintiff's functionality, stating, "[t]here is no evidence of a level of impairment to this extreme.  This

---

[9] In addition, Defendants assert that Dr. Osborne is not an impartial medical examiner as evidenced by his website, which refers to "greedy lawyers, malicious insurance companies, potential financial ruin, total chaos and corruption within the legal system."  (DSOF ¶ 97; Doc 35-1, Exhibit C.)  Demer objects to DSOF ¶ 97, contending that this information was not timely disclosed, and therefore should not be considered.  (PRDSOF ¶ 97.)  As an appeal from an administrative record, this case is exempt from disclosure requirements.  *See* Fed. R. Civ. P. 26(a)(1)(B)(i). Plaintiff also asserts that the information is unfairly presented and does an injustice to Dr. Osborne.  (PRDSOF ¶ 97.) This information was provided on a website that was endorsed by Dr. Osborne and created to raise funds for his legal defense in an unrelated matter.  Plaintiff does not challenge the authenticity of the website.  Because the accuracy and reliability of the website can be readily determined, the Court will take judicial notice of its contents.  *See* Fed. R. Evid. 201(b)(2); *see also Wible v. Aetna Life Ins. Co.*, 375 F.Supp.2d 956, 965-66 (C.D. Cal. 2005) (taking judicial notice of a page from the website of the American Academy of Allergy Asthma & Immunology for the purpose of evaluating a "conflict of interest" in an ERISA disability case).  However, Dr. Osborne's alleged bias is not dispositive of this case.

29

would indicate that the claimant is bedridden for more than 20 hours a day."  Dr. Del Valle found that the medical evidence supported Dr. David Weidman's functionality findings.  She opined that Plaintiff could work under appropriate restrictions and limitations.  Dr. Del Valle's opinion changed only slightly after reviewing Dr. Osborne's new findings because the 7/16/10 MRI did not show a significant change compared to the  6/22/09 MRI.

Plaintiff incorrectly contends that Dr. Del Valle relied on Dr. David Weidman's "stale" findings.[10]   Dr. Del Valle clearly explained why she rejected Dr. Osborne's determination that Plaintiff was completely disabled and reviewed the test results ordered by Dr. Osborne in 2010.  Taking into consideration all the medical evidence, Dr. Del Valle opined that Dr. David Weidman's functional assessment of Plaintiff - not the evidence he relied on at the time he wrote his Attending Physician Statement - was most clearly supported by the entire medical record.  The Court finds that Dr. Del Valle's opinion was grounded in the medical evidence and MetLife acted reasonably in relying on her review.

Plaintiff also asserts that Dr. Del Valle agreed with most of the treating physicians diagnoses, but her subjective determination as to his functional capacity was at odds with her diagnosis.  Plaintiff argues that MetLife should have ordered a functional capacity evaluation or paid for their IPCs to personally examine Demer to eliminate the subjectivity of their IPCs' determinations.  MetLife, however, was not required to do so.  The terms of the Plan require Plaintiff to provide proof showing that Plaintiff has satisfied the conditions and requirements for any benefit; "Proof must be provided at claimant's expense."  Doc. 36-1, AR 24; *see also Morales-Alejandro*, 486 F.3d at 700 (1st Cir. 2007) (it is claimant's burden to prove that he is disabled within the plan's definition).

The Court next considers the factual findings made by MetLife on the administrative appeal. MetLife retained the services of Dr. Goldman and Dr. Gordan to review Plaintiff's

_____

[10] Plaintiff contends throughout his Reply (Doc. 41) that MetLife should have accorded more weight to the treating physicians rather than its IPCs.  This argument is completely without merit.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003) (holding that "plan administrators are not obliged to accord special deference to the opinions of treating physicians.")

30

psychiatric and physiological conditions.  Dr. Goldman conducted a "page by page" review of Plaintiff's medical file and noted preliminarily that Plaintiff has not been seen "with a frequency or intensity that would be deemed appropriate for the level of afunctionality reported by the claimant's providers."  He concluded that "[g]iven the lack of recent data and the paucity of any compelling objective findings, as well as the lack of serial mental status examinations, this reviewer would be unable to establish the presence of an impairing mental condition."  Dr. Goldman considered all the information in the file and found it insufficient to make a finding of mentally disabled.[11]

With regard to Plaintiff's physical limitations, Dr. Gordan prepared an eighteen-page report.  Dr. Gordan concluded that Plaintiff "likely has a modicum of discomfort from muscle contraction headache, neck and back pain related to spinal degeneration, and referred pain down the limbs from those degenerative changes."  Similar to Dr. Del Valle, Dr. Gordan opined that, although Plaintiff was surely in pain, he was capable of functioning under appropriate restrictions and limitations.  MetLife reasonably relied on these findings.

In sum, the record taken as a whole establishes that MetLife reasonably relied on its IPCs' reports.  Every doctor agreed that Plaintiff suffered from a combination of depression and chronic pain syndrome, but every doctor also had a different opinion as to Plaintiff's future functionality.  MetLife was required to choose between divergent opinions.  MetLife's decision to rely on its IPCs' findings was reasonable.

## CONCLUSION

Because MetLife has taken affirmative steps to ameliorate its structural conflict of interest, the IPCs did not abandon their roles to objectively review the medical evidence, and

---

[11] The parties argue extensively over the scope of Dr. Goldman's response: "[b]eyond October 29, 2010, there clearly are no objective or other compelling or convincing data to establish functional impairment as a result of Mr. Demer's *psychotropic* medications."  (Doc. 39-2, AR 668.) (Emphasis added.)  Dr. Goldman appears to have qualified his answer as to mood-altering drugs (psychotropic), however, Dr. Goldman also opined that he was "unable to establish the presence of an impairing mental condition." Therefore, the Court finds that MetLife's determination that the medical evidence *in totality* does not support psychiatric limitations that would prevent Plaintiff from performing any occupation beyond October 29, 2010 was reasonable.

31

the record as a whole supports the denial of benefits, the Court concludes that MetLife's determination was not affected by its structural conflict of interest and that MetLife operated within its discretion in denying Demer's claim.

Accordingly, IT IS ORDERED as follows:

1.   Plaintiff's Motion for Summary Judgment (Doc. 28) is DENIED.

2.   Defendants' Cross-Motion for Summary Judgment (Doc. 34) is GRANTED.

3.   The Clerk of the Court shall enter judgment in favor of Defendants and close its file in this matter.

DATED this 30th day of September, 2013.


Jennifer G. Zipps
United States District Judge

32